**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ST. PAUL MERCURY INSURANCE COMPANY, a Minnesota corporation | Case No. 12-CV-05952-LHK |
| Plaintiff, | |
| v. | ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT |
| AMERICAN SAFETY INDEMNITY COMPANY, et al., | |
| Defendants. | |

Plaintiff St. Paul Mercury Insurance Company ("St. Paul") initiated this litigation against Navigators Specialty Insurance Company ("NSIC"), Virginia Surety Company ("Virginia"), Lexington Insurance Company ("Lexington"), and Gemini Insurance Company ("Gemini") (collectively, "Defendants"), for declaratory judgment and equitable contribution.  *See* First Am. Compl., ECF No. 160.  St. Paul claims that Defendants had a duty to defend and/or indemnify Shapell Industries, Inc. ("Shapell") regarding claims alleged in an underlying proceeding, *Eagle Ridge HOA v. Shapell Industries, Inc. dba Eagle Ridge Development Company, LLC* ("Calderon proceeding").  The Eagle Ridge Homeowners Association ("Eagle Ridge HOA" or "HOA") brought the underlying action for construction defects in the Eagle Ridge Community Center and pool area located in Gilroy, California (the "Community Center").  *Id.* ¶ 61.

1

Case No. 12-CV-05952-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING
DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

Both parties have cross-moved for summary judgment. St. Paul filed a Motion for Partial Summary Judgment, in which St. Paul contends that Defendants had a duty to defend Shapell in the underlying action as an "additional insured" under insurance policies issued by Defendants to several of Shapell's subcontractors. *See* ECF No. 238 ("Pl. Mot."). Defendants filed a joint Opposition, *see* ECF No. 242, and St. Paul filed a Reply, *see* ECF No. 245. Additionally, Defendants filed a Joint Motion for Summary Judgment or, in the alternative, partial summary judgment, in which they contend that Shapell is not an additional insured and that therefore the Defendant insurers had neither a duty to defend nor a duty to indemnify Shapell as to the underlying action. *See* ECF No. 239-1 ("Joint Mot."). Plaintiff filed an Opposition, *see* ECF No. 243, and Defendants filed a joint Reply, *see* ECF No. 246.

The Court finds the Motions suitable for decision without oral argument pursuant to Civil Local Rule 7-1(b), and therefore VACATES the hearing on these Motions and the Case Management Conference set for May 22, 2014. Having considered the briefing, the record in this case, and applicable law, the Court GRANTS Defendants' Motion for Summary Judgment and DENIES St. Paul's Motion for Partial Summary Judgment.[1]

# I.    BACKGROUND

## A.    The Eagle Ridge Development

This action and the underlying Calderon proceeding in state court arise out of alleged construction defects at a housing development in Gilroy, California, known as Eagle Ridge. Pl. Mot. at 1. Shapell served as the owner/developer and general contractor for the Eagle Ridge project, and built five of the nine developments in Eagle Ridge, as well as a Community Center and community pool. *See id.*; Joint Mot. at 1. Shapell employed several subcontractors to perform construction services at the Eagle Ridge development, first on homes at the site and later on the Community Center. *See* Pl. Mot. at 1; Joint Mot. at 1-3. Defendants provided insurance to those subcontractors, as described below.

---

[1] As explained below, Defendants Lexington and Gemini have reached settlements with St. Paul, and the Court has accordingly denied without prejudice these parties' cross-motions for summary judgment. *See* ECF No. 250.

Case No. 12-CV-05952-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING
DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

**United States District Court**
For the Northern District of California

### 1.   Padilla Construction

In 2002, Shapell employed Padilla Construction ("Padilla"), insured by Defendant NSIC, to perform construction services for homes at "The Glens at Eagle Ridge," one of the developments at Eagle Ridge.  *See* ECF No. 240-2, Ex. 31 ("Padilla Contract").  Shapell also subsequently hired Padilla to perform additional work on the Community Center.  Shapell and Padilla entered two agreements at issue here.

First, the parties executed a contract dated October 22, 2002 regarding construction on homes at Eagle Ridge.  *Id.* at SPM 01238.  The contract specifies that Padilla was to work on "Models" (individual homes) and to "furnish the labor, management, materials … and services in connection with the ["Glens at Eagle Ridge"] Project, as applicable, . . . more fully described in the 'Scope of Work' attached hereto as Exhibit 1."  *Id.*  The "Scope of Work" described in Exhibit 1 is stated as "Lath & Plaster" work at "The Glens," with various provisions setting out the "Work Included," such as "Installing one layer one hour grade 'D' building paper," "Brush/scrub coat at foundation," and "Supply scaffold."  *Id.* at SPM 01248-50.  Various addenda to the contract specify additional "Lath & Plaster" work at "The Glens at Eagle Ridge," with the prices at which Shapell would pay for work on different plans.  *See, e.g.*, *id.* at SPM 01233.  The addenda explicitly identify the contract to which they pertain by identifying the contract date, and state that the reason for the addendum is to incorporate the newer releases into the prior contract.  *Id.* ("Addendum #4 to Contract Dated 10/22/02").

Exhibit 4 to the contract is the "Insurance Summary," which required Padilla to obtain a liability policy identifying Shapell as an additional insured.  *Id.* at SPM 01254.  While the pre-printed contract originally required Padilla to obtain insurance covering "All Northern California Operations," the parties struck this language and specifically limited the requirement to "The Glens at Eagle Ridge."  *Id.*  Padilla duly obtained a liability policy from NSIC which, through an endorsement, provided additional insured coverage where "obligated by virtue of a written contract."  ECF No. 240-3, Ex. 36 ("NSIC Policy") at NAVI-PCC000449; *see also* ECF No. 240-3, Ex. 37 at NAVI-PCC000503.

3

Second, on May 23, 2006, Shapell entered into a purchase order with Padilla to "supply all material and labor for the Eagle Ridge community center per plan."  ECF No. 240-2, Ex. 33 ("Padilla Purchase Order") at SPM01546.  This work relates to the Community Center, not the homes described above.  The "plans" to which the Padilla Purchase Order refers are proposals and/or quotes submitted by Padilla, which set forth the scope of the work to be done at the Community Center and the costs to be paid by Shapell.  *See* ECF No. 240-2, Ex. 32 at NAVI-PCC000153-57.  The Padilla Purchase Order was based on a pre-printed form created by Shapell, which had blanks for the parties, scope of work, terms, signatures, and dates.  *See* Padilla Purchase Order at SPM01546.

In the Padilla Purchase Order, the following fields were completed: two "Date" fields (corresponding to the dates the Purchase Order was prepared and executed), "Ship to Tract," "Date Required," "Confirming To," and the "Owner and/or subcontractor" signature field.  *Id*.  The form also included a field entitled "Subject to the conditions stated on the face and back hereof, please deliver the following materials and/or labor," which was filled out with the following: "Cost Code: 19652-13-192," "Supply all material and labor for the Eagle Ridge Community Center per plan," "Total Purchase Order. $37,420.00."  *Id*.  The total cost figure was stricken, and below the following was written by hand: "$26,380 16/20 Sand OK BbM."  *Id*.  The following fields were left blank: "F.O.B.," "Terms," "Unit or Lot No.," "Time," and the "Subcontractor and/or supplier" signature field.  *Id*.

Critically, the pre-printed purchase order form has a standard provision at the bottom:

> All work performed under this Purchaser Order is to be performed in accordance with the Terms and Conditions of the contract between you and Shapell Industries of Northern California, Inc., dated the _____ day of _____, to cover the above referenced tract.

*Id*.  In the Padilla Purchase Order, the dates were left blank.  *Id*.  Shapell's pre-printed form does not itself include any insurance requirement, and the Padilla Purchase Order does not otherwise include such a requirement.

Padilla performed its work on the Community Center between September 15, 2006 and November 10, 2006.  *See* ECF No. 240-2, Ex. 35.

4

2.      **CBC Framing**

In 2005, Shapell employed CBC Framing, Inc. ("CBC"), insured by Defendant Virginia, to perform construction services for homes at "The Creekside at Eagle Ridge," one of the developments at Eagle Ridge.  *See* ECF No. 240-4, Ex. 38 ("CBC Contract").  Shapell also subsequently hired CBC to perform additional work on the Community Center.  As with Padilla, Shapell and CBC entered two agreements relevant here.

First, the parties executed a contract dated December 19, 2005 regarding construction on homes at Eagle Ridge.  *Id*. at VS000001.  The contract specifies CBC was to work on individual homes and "furnish the labor, management, materials … and services in connection with the ["Creekside at Eagle Ridge"] Project, as applicable, . . . more fully described in the 'Scope of Work' attached hereto as Exhibit 1."  *Id*.  The "Scope of Work" described in Exhibit 1 is stated as "Rough Carpentry" work at "Creekside at Eagle Ridge," with various provisions setting out the "Work Included," such as "Supply and install all roof trusses, floor trusses and glue laminated beams," "Install vents and sheetmetal . . . ," and "Caulking all wood to wood joints at siding and trim."  *Id*. at VS000012-15.

Exhibit 4 to the contract is the "Insurance Summary," which required CBC to obtain a liability policy identifying Shapell as an additional insured.  *Id*. at VS000018-19.  Unlike the Padilla Contract, which was modified to be limited to the development, the CBC Contract's insurance requirement compelled CBC to obtain a liability policy for which the "project/job description or description of operations" would be "All California Operations."  *Id*. at VS000019.

Second, on June 6, 2006, Shapell entered into a purchase order[2] with CBC to "supply all material and labor for the Eagle Ridge community center per plan."  ECF No. 240-4, Ex. 39 ("CBC Purchase Order") at SPM 01500.  The Padilla and CBC Purchase Orders are substantially identical: both have the same blank fields, and both were completed in the same way but with different

---

[2] There is another purchase order between Shapell and CBC dated May 23, 2006, with "Please re-do" handwritten across the front.  *See* CBC Purchase Order at SPM 01503.  The corrected CBC Purchase Order is dated June 6, 2006, and is identical except for the date and the cost amounts.  *See id*. at SPM 01500.

Case No. 12-CV-05952-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING
DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

**United States District Court**
For the Northern District of California

names for Padilla and CBC, and with different costs for each.  *See* Padilla Purchase Order; CBC Purchase Order.  The CBC Purchase Order contains the same standard provision at the bottom that states: "All work performed under this Purchase Order is to be performed in accordance with the Terms and Conditions of the contract between you and Shapell Industries of Northern California, Inc., dated the _____ day of _____, to cover the above referenced tract."  CBC Purchase Order at SPM 01500.  As with the Padilla Purchase Order, the dates were left blank on the CBC Purchase Order, and the CBC Purchase Order itself includes no insurance requirement.  *See id.*

The parties do not state when CBC completed all of its work at the Community Center, but all subcontractors completed their work at the Community Center by March 2007.  *See* ECF No. 239-5, Ex. 9, at 6.

### 3.   Perma-Green

Shapell employed Perma-Green Hydroseeding, Inc. ("Perma-Green," who is not a party here), insured by St. Paul, to perform construction services at the "Eagle Ridge—Creekside Recreation Complex."  *See* ECF No. 239-4, Ex. 1.  The Shapell-Perma-Green contract, dated August 3, 2006, specifies that Perma-Green was to perform landscaping services for areas around the recreation complex, including work at the Community Center.  *Id.* at SPM 01261, 01269.  Exhibit 4 to the contract is the "Insurance Summary," which required Perma-Green to obtain a liability policy identifying Shapell as an additional insured.  *Id.* at SPM 01274.  Like the CBC Contract, but unlike the Padilla Contract, the insurance requirement obligated Perma-Green to obtain a liability policy for which the "project/job description or description of operations" would be "All California Operations."  *Id.* at SPM 01275.

As with Padilla and CBC, Shapell asked Perma-Green to perform additional work around the Community Center.  However, instead of completing purchase orders for this work, Shapell and Perma-Green executed four "change orders" dated March 19, 2007, July 9, 2007, July 25, 2007, and September 17, 2007.  *See* ECF No. 239-4, Ex. 2.  Like the Padilla and CBC Purchase Orders, the Perma-Green change orders consisted of pre-printed forms with blanks for the parties, scope of work, terms, signatures, and dates.  *Id.*  Also like the Purchase Orders, the change order

Case No. 12-CV-05952-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING
DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

form does not itself include any insurance requirement, but does include a section that references a prior contract and has a blank to fill in the date of the contract.  *Id.*  Unlike the Purchase Orders, each of the four change orders specifically references the original Perma-Green contract by date.  *See, e.g.*, *id.* at SPM 01554 ("Change Order No.  __1__ to Contract dated __8/3/06__").  The change orders also state that "[a]cceptance of this order in writing shall constitute acceptance of all the terms and conditions of the original contract as they apply to this change order."  *Id.*

B.      **The Insurance Policies**[3]

1.      **NSIC Coverage of Padilla**

NSIC issued Padilla two general liability policies: No. OC10CGL015656-00, effective from January 1, 2010 to January 1, 2011; and No. OC10CGL015656-01, effective from January 1, 2011 to January 1, 2012.  ECF No. 240-3, Exs. 36, 37.  Padilla was the named insured under both policies.  *Id.*

The NSIC policies to Padilla contain blanket additional insured endorsement ANF-ES 160 (5/ 2006), which amends the policies to include as an additional insured any entity "obligated by virtue of a written contract."  NSIC Policy at NAVI-PCC000449; Ex. 37 at NAVI-PCC000503.  The endorsement also states that "it does not apply to any work involving or related to properties intended for permanent residential or habitational occupancy (other than apartments)."  *Id.*

2.      **Virginia's Coverage of CBC**

Virginia issued CBC two general liability policies, only one of which is relevant here: No. 1CG0000050174701 effective from January 14, 2006 to January 14, 2007.  ECF No. 240-7, Ex. 43 ("Virginia Policy").[4]  CBC was the named insured under this policy.  *Id.*

---

[3] The liability policy issued by St. Paul to Perma-Green was not produced by the parties.  However, St. Paul defended Shapell in the underlying Calderon proceeding on the basis of Shapell's status as an additional insured under that policy.  *See* Pl. Mot. at 2.

[4] The earlier Virginia policy, No. 1CG0000050174700, was effective from January 14, 2005 to January 14, 2006, and expired before CBC began work on the Community Center.  ECF No. 240-6, Ex. 42.  Because that policy applies only to property damage during the policy period, there is no possibility that CBC's work caused damage that would be covered under the earlier policy.  *See id.* at VS000041 ¶ 1.b.(2).

7

Case No. 12-CV-05952-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING
DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

The policy that Virginia issued to CBC contains blanket additional insured endorsement CG 20 10 03 97, which amends the policy to include as an additional insured any entity "where required by written contract," "but only with respect to liability arising out of [CBC's] ongoing operations performed for that insured." *Id*. at VS000147.

### C.       The Underlying Eagle Ridge Calderon Proceeding

On June 10, 2010, the Eagle Ridge HOA served Shapell with a Notice of Commencement of Legal Proceedings pursuant to Cal. Civil Code § 895, *et seq*., alleging design and/or construction defects to portions of the common areas of the Eagle Ridge development, including: (1) the pool and pool equipment; and (2) the pool deck, railings, and gates.  Pl. Mot. at 2.  On December 28, 2010, the HOA served a second Notice of Commencement of Legal Proceedings on Shapell, alleging defects in design, construction, and maintenance of additional parts of the common areas of the Eagle Ridge development, including: (1) exterior glazed openings (Community Center); (2) exterior elevations (Community Center); (3) roof covering system and drainage (Community Center); (4) attic spaces (Community Center); (5) building interiors (Community Center); (6) plumbing, mechanical and electrical systems (Community Center); (7) basketball court and retaining wall; (8) tennis courts and chain link fencing; (9) public restroom building and park area (tract No. 9365); and (10) common grounds/drives.  *Id*.  Neither Notice specified when the damage at issue occurred, whether before or after construction was completed.  *See id*.

Shapell tendered its defense in the Calderon proceeding to St. Paul and the Defendant insurers pursuant to policies issued to the subcontractors whose allegedly defective work formed the basis of the Calderon action.  The tender was based on Shapell's asserted status as an additional insured under the commercial general liability policies issued by St. Paul and the Defendant insurers to Shapell's subcontractors on the Eagle Ridge project.  *Id*.  Shapell tendered its defense pursuant to the underlying claims to St. Paul on October 15, 2010; to NSIC on June 2, 2011; and to Virginia on February 10, 2011.  Joint Mot. at 3.

On the basis of the commercial general liability policy St. Paul issued to Perma-Green, St. Paul defended Shapell in the Calderon proceeding.  Pl. Mot. at 2.  The parties reported that the

8

Calderon proceeding has been resolved.  *See* ECF No. 249 at 2.  However, because Defendants

declined to defend Shapell in the Calderon proceeding, St. Paul brought this suit seeking

declaratory judgment and equitable contribution.  At issue are both NSIC and Virginia's policies,

issued to Padilla and CBC, respectively.  *Id*. at 2-7.  In short, St. Paul contends that Defendants

owe St. Paul contributions due to the Defendants' insurance policies with Shapell's subcontractors,

whose work was implicated in the Calderon proceeding.

The construction services provided by each subcontractor and the corresponding defects

alleged in the Calderon proceeding, which St. Paul argues triggered Defendant insurers' duty to

defend Shapell, are the following:

| Subcontractor | Construction Services | Alleged Defects |
|---|---|---|
| Padilla (insured by NSIC) | Supplied and installed flashing at light boxes, electrical outlet boxes and pipe penetrations, and supplied and applied stucco.  Pl. Mot. at 6. | Defects to "exterior glazed openings (community center)" and damages due to water penetration at exterior glazed openings and discoloration to paint.  Pl. Mot. at 6. |
| CBC (insured by Virginia) | Supplied materials and performed rough framing and installed windows to the Eagle Ridge Community Center.  Pl. Mot. at 7. | Defects to "building interiors (community center)," specifically "water intrusion past the window system … into wall cavities" and "damages/deformed weather stripping at single hung windows" related to window installation and trim.  Pl. Mot. at 7. |

**D.      Procedural History**

St. Paul filed this lawsuit on November 21, 2012.  ECF No. 1.[5]  On February 20, 2014, both

St. Paul and all remaining Defendants cross-moved for summary judgment.  St. Paul filed a Motion

for Partial Summary Judgment, in which St. Paul contends that Defendants had a duty to defend

Shapell in the underlying action as an additional insured under insurance policies issued by

Defendants to several of Shapell's subcontractors.  *See* Pl. Mot., ECF No. 238.  Defendants filed a

Joint Motion for Summary Judgment, or in the alternative, partial summary judgment, in which

they contend that Shapell is not an additional insured and that therefore the Defendant insurers had

---

[5] St. Paul originally brought this suit against twenty-two defendants.  *See* ECF No. 1.  In the fifteen months that followed, all but four Defendants were dismissed pursuant to the parties' stipulations. *See*, *e.g.*, ECF Nos. 120-25, 234-36.

Case No. 12-CV-05952-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING
DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

1    neither a duty to defend nor a duty to indemnify Shapell as to the underlying action.  *See* Joint

2    Mot., ECF No. 239-1.  On March 6, 2014, both sides filed Oppositions.  *See* ECF No. 242 ("Joint

3    Opp'n"); ECF No. 243 ("Pl. Opp'n").  On March 13, 2014, both sides filed Replies.  *See* ECF No.

4    245 ("Pl. Reply"); ECF No. 246 ("Joint Reply").

5         In their cross-motions, the parties identify several potentially dispositive issues.  St. Paul

6    argues that it is entitled to partial summary judgment on Defendants' duty to defend because

7    Defendants cannot establish conclusively that the relevant insurance policies do not apply to the

8    alleged construction defects.  *See* Pl. Mot. at 8-10.  Defendants raise multiple grounds for summary

9    judgment that apply to some but not all Defendants, including arguments that the subcontractors'

10   Purchase Orders do not provide for insurance and that certain exclusions preclude coverage for the

11   specific construction defects disputed here.  *See* Joint Mot. Appx. A.

12        On May 13, 2014, St. Paul and Defendants Lexington and Gemini indicated they had

13   reached settlements.  ECF No. 249 at 2-3.  Accordingly, on May 14, 2014, the Court dismissed

14   without prejudice these parties' cross-motions for summary judgment.  ECF No. 250.

15   **II.     LEGAL STANDARDS**

16        Summary judgment is appropriate if, viewing the evidence and drawing all reasonable

17   inferences in the light most favorable to the nonmoving party, there are no genuine disputed issues

18   of material fact, and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a);

19   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is "material" if it "might affect the

20   outcome of the suit under the governing law," and a dispute as to a material fact is "genuine" if

21   there is sufficient evidence for a reasonable trier of fact to decide in favor of the nonmoving party.

22   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "If the evidence is merely colorable, or

23   is not significantly probative," the court may grant summary judgment.  *Id.* at 249-50 (citations

24   omitted).  At the summary judgment stage, the court "does not assess credibility or weigh the

25   evidence, but simply determines whether there is a genuine factual issue for trial."  *House v. Bell*,

26   547 U.S. 518, 559-60 (2006).  The standards for partial summary judgment are identical to the

27

28

10

1    standards for summary judgment.  *See E.piphany, Inc., v. St. Paul Fire & Marine Ins. Co.*, 590 F.

2    Supp. 2d 1244, 1250 (N.D. Cal. 2008).

3          The moving party has the burden of demonstrating the absence of a genuine issue of fact for

4    trial.  *Celotex*, 477 U.S. at 323.  To meet its burden, "the moving party must produce either

5    evidence negating an essential element of the nonmoving party's claim or defense or show that the

6    nonmoving party does not have enough evidence of an essential element to carry its ultimate

7    burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102

8    (9th Cir. 2000).  Once the moving party has satisfied its initial burden of production, the burden

9    shifts to the nonmoving party to show that there is a genuine issue of material fact.  *Id.* at 1103.

## III.    DISCUSSION

11         Among their theories for summary judgment, NSIC and Virginia argue that they are entitled

12   to judgment because the subcontractors that they insured (Padilla and CBC, respectively) were not

13   required to name Shapell as an "additional insured" under the insurance policies covering work on

14   the Eagle Ridge Community Center.  NSIC and Virginia contend that the Purchase Orders between

15   Shapell and the subcontractors simply did not incorporate prior agreements between the contracting

16   parties that could have triggered the requirement for additional insured coverage.  The Court finds

17   this issue dispositive for both Defendants.

18         St. Paul seeks contribution from Defendants because St. Paul defended Shapell in the

19   Calderon proceeding for alleged construction defects from work performed by Shapell's

20   subcontractors on the Community Center.  The subcontractors' work on the Community Center

21   was performed under the 2006 Purchase Orders discussed above.  The subcontractors obtained

22   insurance policies from NSIC and Virginia, but those policies provided "additional insured"

23   coverage only to the extent that the subcontractors were required by "written contract" to obtain

24   such coverage for another party.  *See* NSIC Policy at NAVI-PCC000449; Virginia Policy at

25   VS000147.  Thus, the critical issue for both NSIC and Virginia is whether the Purchase Orders

26   were "written contracts" that obligated Padilla and CBC to obtain additional insured coverage for

27   Shapell.  If so, Defendants had a duty to defend Shapell as an additional insured.

28

**United States District Court**
For the Northern District of California

1    The Purchase Orders themselves contain no provisions about insurance coverage.

2    Moreover, the Purchase Orders each contain a standard provision to refer to a prior contract, but

3    the required dates were left blank.  St. Paul argues that the Purchase Orders incorporate the

4    insurance provisions of the earlier Padilla and CBC Contracts because the Purchase Orders

5    reference "the terms and conditions of the previous contract between Shapell and [the

6    subcontractors." Pl. Mot. at 13, 14.  Under St. Paul's theory, because the original contracts

7    required the subcontractors to obtain liability policies identifying Shapell as an additional insured,

8    Shapell qualifies as an additional insured under the respective subcontractor liability policies.  *Id.*

9    at 12-15.  By contrast, Defendants contend that the Purchase Orders did not incorporate by

10   reference the prior contracts because the spaces available to identify a prior contract were left

11   blank.  Joint Opp'n at 3.  Consequently, Defendants argue that Shapell is not covered by the

12   relevant policy endorsements providing coverage to additional parties where required by "written

13   contract" because the relevant contracts—the Purchase Orders—did not contain such a

14   requirement.  *Id.*[6]

15       The question of incorporation by reference resolves whether Shapell is potentially covered

16   by the liability policies issued to the subcontractors by NSIC and Virginia, and is consequently

17   dispositive of the question of Defendants' duty to defend Shapell.  *See, e.g.*, *Certain Underwriters*

18   *at Lloyd's of London v. Am. Safety Ins. Servs., Inc.*, 702 F. Supp. 2d 1169, 1174 (C.D. Cal. 2010)

19   (where purchase order did not require additional insured coverage, company did "not meet the

20   requirements of an additional insured under the Blanket Endorsement").

21       **A.    Incorporation by Reference**

22       Whether the 2006 Purchase Orders incorporate by reference the terms and conditions of the

23   earlier contracts is a question of law to be determined by the Court.  *See SDR Capital Mgmt., Inc.*

---

[6] Defendants also identify several exclusions in the relevant liability policies, which they argue
preclude coverage and accordingly defeat any duty to defend Shapell in the underlying proceeding.
*See* Joint Mot. at 10-23.  Because the Court's conclusion regarding the question of whether the
Purchase Orders at issue incorporated the insurance requirements from the prior contracts is
dispositive, the Court need not address Defendants' other arguments.

Case No. 12-CV-05952-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING
DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

*v. Am. Int'l Specialty Lines Ins. Co.*, 320 F. Supp. 2d 1043, 1046 (S.D. Cal. 2004) ("Under California law, it is well settled that the interpretation of a contract is a question of law for the trial court's determination."); *see also Welles v. Turner Entm't Co.*, 503 F.3d 728, 735 (9th Cir. 2007) ("The interpretation of a contract is a question of law . . . ."). The parties do not dispute that the Purchase Orders are contracts formed in California and governed by California law. Thus, to resolve the parties' dispute about the meaning and effect of the Purchase Orders' pre-printed but incomplete reference, the Court applies California law governing interpretation of contracts, which "teach[es] us that the overriding goal of interpretation is to give effect to the parties' mutual intentions as of the time of contracting." *Shaw v. Regents of the Univ. of Cal.*, 58 Cal. App. 4th 44, 53 (1997) (citation omitted). "Where contract language is clear and explicit and does not lead to absurd results, we ascertain intent from the written terms and go no further." *Ticor Title Ins. Co. v. Employers Ins. of Wausau*, 40 Cal. App. 4th 1699, 1707 (1995); *see also* Cal. Civ. Code § 1638 ("The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity."); *id.* § 1639 ("When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible . . . .").

By their terms, the Purchase Orders provided the prices at which Shapell hired Padilla and CBC to perform the specified construction services. *See* CBC Purchase Order at SPM 01500 (CBC will "supply all material and labor for the Eagle Ridge Community Center per plan," for which Shapell agreed to pay $57,440.00). The text of the Purchase Orders imposes no insurance requirement, so if such a requirement is to be read into the Purchase Orders between Shapell and the subcontractors, it must come from the prior contracts that those parties entered. The critical question, then, is whether the following language in the Purchase Orders incorporates by reference the prior contracts between the parties: "All work performed under this Purchaser Order is to be performed in accordance with the Terms and Conditions of the contract between you and Shapell Industries of Northern California, Inc., dated the _____ day of _____, to cover the above referenced tract." *Id.* St. Paul contends that Shapell and the subcontractors intended to cross-reference their earlier agreements, even though they left these provisions blank. *See* Pl. Opp'n at

**United States District Court**
For the Northern District of California

5-7.  Defendants disagree, arguing that the prior contracts were not properly incorporated.  *See*

Joint Reply at 2-6.

The doctrine of incorporation by reference allows a document or provision to be read into

an agreement despite being omitted from the agreement itself.  11 Richard A. Lord, Williston on

Contracts § 30:25 (4th ed. 2011).  Under California law:

> A contract may validly include the provisions of a document not physically apart
> from the basic contract . . . . It is, of course, the law that the parties may incorporate
> by reference into their contract the terms of some other document. But each case
> must turn on its facts. For the terms of another document to be incorporated into the
> document executed by the parties, the reference must be clear and unequivocal, the
> reference must be called to the attention of the other party and he must consent
> thereto, and the terms of the incorporated document must be known or easily
> available to the contracting parties.

*Shaw*, 58 Cal. App. 4th at 54 (internal quotation marks omitted) (quoting *Williams Constr. Co. v.*

*Standard-Pac. Corp.*, 254 Cal. App. 2d 442, 454 (1967)).  "The contract need not recite that it

'incorporates' another document, so long as it guides the reader to the incorporated document."  *Id.*

(internal quotation marks and citations omitted).

Therefore, to show that Shapell and the subcontractors incorporated the prior contracts into

the Purchase Orders by reference, St. Paul must show that: (1) the references were clear and

unequivocal; (2) the references were called to the attention of the subcontractors and they

consented thereto; and (3) the terms of the incorporated documents were known by or easily

available to the contracting parties.  *Shaw*, 58 Cal. App. 4th at 54; *see also Avery v. Integrated*

*Healthcare Holdings, Inc.*, 218 Cal. App. 4th 50, 66 (2013) (same); *Cariaga v. Local No. 1184*

*Laborers Int'l Union of N. Am.*, 154 F.3d 1072, 1074 (9th Cir. 1998) ("Under California law, for

one document to incorporate another document by reference, the reference to the incorporated

document must be clear and unequivocal and the terms of the incorporated document must be

known or easily available to the contracting parties.") (internal quotations and citation omitted).

The Court assumes for the purposes of this Order that the prior contracts were known or easily

available to the contracting parties.  However, the Court concludes for the following reasons that

the Purchase Orders did not incorporate the prior contracts by reference.

14

1

### 1.   "Clear and Unequivocal" Reference

The purported references in the Purchase Orders are far from "clear and unequivocal."  The disputed clause in both Purchase Orders contains date fields that were left blank.  Padilla Purchase Order at SPM 01546; CBC Purchase Order at SPM 01500.  The parties plainly omitted any reference to the prior contracts by date or name.  Thus, there is no basis on the face of either Purchase Order for determining that a specific prior contract existed, much less that such a contract was fully incorporated by reference.

A clear and unequivocal reference must "guide the reader to the incorporated document." *Shaw*, 58 Cal. App. 4th at 54.  In *Shaw*, an employee of the University of California signed a patent agreement when he was hired, directing him to "Please read the Patent Policy on reverse side and above" and stating that he was "not waiving any rights to a percentage of royalty payments received by University, as set forth in University Policy Regarding Patents." *Id*.  The California Court of Appeal found that this language clearly and unequivocally referenced the Patent Policy contained on the reverse side of the agreement. *Id*.  Not only could the referenced Policy be found on the reverse side of the patent agreement, the patent agreement expressly informed the reader of this fact and expressly referenced the title of the Patent Policy itself. *Id*.

By contrast, in *Chan v. Drexel Burnham Lambert, Inc.*, the California Court of Appeal held that an arbitration provision was not incorporated by reference because the contract at issue did not clearly refer to and identify "the incorporated document wherein the arbitration clause appeared." 178 Cal. App. 3d 632, 642 (1986).  The plaintiff in *Chan* was a stockbroker who applied to be a securities agent and agreed to abide "by the Statute(s), Constitution(s), Rules and By-laws" of the three stock trading organizations to which his application would be submitted. *Id*. at 642-43.  One of the organizations promulgated a rule requiring arbitration.  The court found that this rule was not incorporated into the plaintiff's application because "the reference did not identify any document or source by title." *Id*.  The Court found that such an "amorphous" reference not only failed to identify the rule by name or number, but more generally failed to guide the reader to the incorporated document. *Id*.

Case No. 12-CV-05952-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING
DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

1        Other cases have followed the guidance of *Shaw* and *Chan* in requiring specific

2   identification of the extrinsic terms for which incorporation is sought.  *See, e.g.*, *Fogel v. Farmers*

3   *Grp., Inc.*, 160 Cal. App. 4th 1403, 1420 (2008) (rejecting incorporation partly because the

4   reference "did not identify the subscription agreement by its title"); *Troyk v. Farmers Grp., Inc.*,

5   171 Cal. App. 4th 1305, 1331 (2009) ("[T]he policies in this case did not clearly and unequivocally

6   refer to and incorporate the service charge (*i.e.*, part of premium) disclosed only in the Prematic

7   Agreement and Prematic's bills."); *Paramount Farms, Inc. v. Ventilex B.V.*, 735 F. Supp. 2d 1189,

8   1219 (E.D. Cal. 2010) (rejecting incorporation of document "neither referred to in the Proposal

9   Contract nor attached to the version of the Proposal Contract signed").  Even if the other party is

10  aware of the extrinsic document, an express incorporation is required.  *See Amtower v. Photon*

11  *Dynamics, Inc.*, 158 Cal. App. 4th 1582, 1608 (2008) ("But it is not simply the party's awareness

12  of the other document that is required.  To impliedly incorporate an external document by

13  reference, the subject document must contain some clear and unequivocal reference to the fact that

14  the terms of the external document are incorporated.").

15        In this case, the purported incorporation by reference consists of pre-printed language on a

16  boilerplate Shapell form, which expressly includes blank fields in which the parties could input the

17  date of a prior contract to incorporate it into the purchase order.  *See* Padilla Purchase Order at

18  SPM 01546; CBC Purchase Order at SPM 01500.  Those spaces were left blank, despite the

19  existence of prior contracts between the subcontractors and Shapell, the dates of which could have

20  been typewritten on the Purchase Order.  Indeed, Shapell included such reference dates in the

21  Perma-Green change orders discussed above.  *See, e.g.*, *id.* at SPM 01554 ("Change Order No.  __1

22  to Contract dated   __8/3/06__  ").  The Perma-Green change orders also state that "[a]cceptance of

23  this order in writing shall constitute acceptance of all the terms and conditions of the original

24  contract as they apply to this change order."  *Id.*  As another example, the addenda to the Padilla

25  Contract contain express references to the Contract by date.  *See, e.g.*, *id.* at SPM 01233.  Unlike

26  the Perma-Green change orders and the Padilla Contract addenda, the purported references in the

27  Purchase Orders did "not identify any document or source by title [or date,]" and the "reference

28

16

United States District Court
For the Northern District of California

1    was amorphous, and did not guide the reader to the incorporated document." *Chan*, 178 Cal. App.

2    3d at 643.  Despite having pre-printed blanks for doing so, the Purchase Orders failed to specify the

3    referenced contracts' dates, let alone identify which specific terms and conditions were relevant to

4    the new work and were intended for incorporation.  Other spaces in the Purchase Orders—such as

5    "F.O.B."—were also left blank, which further indicates that the parties omitted any optional or

6    irrelevant terms.

7          Two additional aspects of the agreements indicate that there was no "clear and

8    unequivocal" incorporation by reference.  First, over three years elapsed between the Padilla

9    Contract and the Padilla Purchase Order, making it less certain that the latter agreement implicitly

10   incorporated the former.  Second, the incorporation provision in each Purchase Order refers to "the

11   contract between you and Shapell Industries of Northern California, Inc."  Padilla Purchase Order

12   at SPM 01546; CBC Purchase Order at SPM 01500.  However, the Padilla and CBC Contracts

13   were executed with "Eagle Ridge Glen, L.L.C." and "Shapell Homes," respectively.  Padilla

14   Contract at SPM 01238; CBC Contract at VS000001.  St. Paul claims that "Shapell Industries,

15   Inc." does business as "Eagle Ridge Glen, LLC."  Pl. Reply at 3-4.  However, this does not address

16   CBC's contract with "Shapell Homes," which could be a separate entity.

17         St. Paul nevertheless argues that "[t]he purchase order references the terms and conditions

18   of the previous contract between Shapell and Padilla" and between Shapell and CBC.  Pl. Mot. at

19   6, 7.  St. Paul asserts that Shapell understood and intended that the Purchase Orders incorporated

20   the prior contracts.  Pl. Reply at 2-3 ("Shapell understood the work pursuant to the purchase orders

21   it entered into with [NSIC and Virginia's] insured subcontractors were to be performed in

22   accordance with the terms and conditions of the previous subcontracts it had entered into with the

23   same contractors for work on the Eagle Ridge homes.").  St. Paul supports these assertions by

24   citing the Declaration of Heather Hegney (ECF No. 238-2, "Hegney Decl.").  *Id.*  For each of the

25   subcontractors at issue, Hegney identifies and purports to authenticate a copy of the earlier contract

26   between the subcontractor and Shapell.  *See*, *e.g.*, Hegney Decl. ¶ 7.  Hegney also identifies and

27

28

Case No. 12-CV-05952-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING
DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

1    authenticates a copy of the Purchase Order between the subcontractor and Shapell.  *Id.* ¶ 8.  For

2    example, for NSIC and Padilla, Hegney declares:

3         Attached as Exhibit L is a true and correct copy of the Purchase Order between
          Shapell and Padilla for Padilla's work on the Eagle Ridge community center, *to be*
4         *performed in accordance with the terms and conditions of the Shapell/Padilla*
          *subcontract* (Exhibit K).
5

6    *Id.* (emphasis added).

7         Under California law, extrinsic evidence such as the Hegney Declaration may not overcome

8    a failure to provide a clear and unequivocal incorporation by reference.  For example, in *Chan*, the

9    court refused to resort to outside evidence on the question of incorporation by reference, stating:

10   "Because extrinsic evidence would be unavailing as to whether the reference in the alleged

11   agreement to the crucial NYSE rules is on its face clear and unequivocal, we make an independent

12   determination."  178 Cal. App. 3d at 642.  However, even if the Court were to consider Hegney's

13   Declaration for purposes of interpreting the purchase orders, for the reasons discussed below in

14   Part B, the Declaration fails to show the purported incorporation by reference was clear and

15   equivocal to the parties.

               2.        **Consent by the Subcontractors**
16
17        Proper incorporation by reference further requires that "the reference must be called to the

18   attention of the other party and he must consent thereto."  *Shaw*, 58 Cal. App. 4th at 54.  Here, St.

19   Paul has presented no evidence that the subcontractors consented to incorporation of the prior

20   contracts (or the specific insurance provisions) into the Purchase Orders.  St. Paul offers no

21   argument and no evidence regarding whether incorporation was ever discussed at all with Padilla

22   and CBC, nor whether the subcontractors in fact consented to incorporation of the earlier contracts.

23   Rather, St. Paul makes one brief argument relevant to this question: "the fact that each purchase

24   order should be interpreted as including the terms of each previous contract is supported by

25   Shapell's course of dealing with its subcontractors and general usage in such a general contractors'

26   trade."  Pl. Reply at 3.  In support of this claim, St. Paul points to the fact that each of the prior

27   contracts required the subcontractors to obtain a liability policy identifying Shapell as an additional

28   insured.  *Id.*

18

1        However, St. Paul does not explain why it follows that because the parties previously

2   entered contracts requiring additional insured coverage, subsequent purchase orders for different

3   projects (for the Community Center) would necessarily incorporate those prior contracts.  As

4   explained above, Shapell's earlier contracts with Padilla and CBC involved specific work on Eagle

5   Ridge homes, while the Purchase Orders dealt with the Community Center.  Accordingly, the

6   reference in the Purchase Orders to earlier contracts for "the above referenced tract" would not

7   address the Community Center.  Moreover, St. Paul has presented no evidence of course of dealing

8   or general usage that would support its theory, such as other instances where documents were

9   deemed incorporated without a specific reference, or evidence demonstrating an implied

10  understanding between Shapell and the subcontractors.

11       St. Paul also cites extensively to the Hegney Declaration.  *Id.* at 2-3.  Regardless of whether

12  the Hegney Declaration is indicative of *Shapell's* intent, it is completely unavailing as to whether

13  the reference was "called to the attention of the other party"—the subcontractors—and whether the

14  other party "consent[ed] thereto."  *Shaw*, 58 Cal. App. 4th at 54-55 (citation omitted).

15       In sum, the Court concludes that the Purchase Orders between Shapell and Defendants'

16  named insureds, Padilla and CBC, did not incorporate the prior contracts between these parties,

17  including the supposed contractual requirement that the subcontractors obtain liability policies

18  covering Shapell as an additional insured.

19       **B.**       **Ambiguity and Extrinsic Evidence**

20       Alternatively, St. Paul argues that if the purported incorporation by reference in the

21  Purchase Orders is ambiguous, the Hegney Declaration and prior contracts should be admitted as

22  parol evidence to explain the ambiguity.[7]  *See* Pl. Reply at 2-3.  However, Hegney's unsupported

23  statement that Shapell subjectively intended to incorporate the prior contracts into the Purchase

24  Orders does not create a triable issue of fact.

25

26

27  _____

    [7] An ambiguous reference would by definition not be "clear and unequivocal," and the Purchase
    Orders would therefore fail to incorporate the prior contracts on that basis.

28

Case No. 12-CV-05952-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING
DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

**United States District Court**
For the Northern District of California

1    Ultimately, "[t]he goal of contractual interpretation is to determine and give effect to the

2  mutual intention of the parties." *Safeco Ins. Co. v. Robert S.*, 26 Cal. 4th 758, 763 (2001); *see also*

3  *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1264 (1992).  Accordingly, a "court's

4  paramount consideration in construing [a contract] is the parties' objective intent when they

5  entered into it." *Sy First Family Ltd. P'ship v. Cheung*, 70 Cal. App. 4th 1334, 1341 (1999).  "That

6  intent is to be inferred, if possible, solely from the written provisions of the contract." *Pardee*

7  *Const. Co. v. Ins. Co. of the W.*, 77 Cal. App. 4th 1340, 1352 (2000).  Parol evidence is admissible

8  to prove a meaning to which the language of the instrument is reasonably susceptible.  *See Pac.*

9  *Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal. 2d 33, 37 (1968).  However,

10  extrinsic evidence cannot be used to directly contradict an express term of a written contract.  *See*

11  *Gerdlund v. Elec. Dispensers Int'l*, 190 Cal. App. 3d 263, 271 (1987) (California law "does not go

12  so far as to permit proof of a collateral agreement which contradicts an express provision of the

13  written agreement.").

14    The most straightforward inference from the fact that the boilerplate language was not

15  completed in the Purchase Orders is that the contracting parties did not want to incorporate the

16  terms and conditions of any prior contract.  If Shapell wished to incorporate the previous contracts,

17  it had an easy and simple means of doing so in its own standard forms.  Additionally, Shapell

18  created the pre-printed forms and was therefore the source of any ambiguities.  Under California

19  law, any ambiguities must be construed against Shapell.  *See* Cal. Civ. Code § 1654 ("In cases of

20  uncertainty not removed by the preceding rules, the language of a contract should be interpreted

21  most strongly against the party who caused the uncertainty to exist."); *see also In re Ankeny*, 184

22  B.R. 64, 70 (B.A.P. 9th Cir. 1995) ("Any uncertainty is construed against the drafter.").  Moreover,

23  "[p]rinted contracts must be interpreted most strongly against party preparing the form." *Mills v.*

24  *Hunter*, 103 Cal. App. 2d 352, 357-58 (1951).

25    However, even if the Purchase Orders were ambiguous, the minimal extrinsic evidence in

26  the record cannot resolve the ambiguity in St. Paul's favor, for at least two reasons.  First, even if

27  Hegney's conclusory statements about the Purchase Orders were competent evidence to show the

28

Case No. 12-CV-05952-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING
DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

1    parties' objective intent, her declaration provides no factual basis for her conclusion.  While

2    Hegney appears to have executed the Purchase Orders on behalf of Shapell, her assertion that the

3    work performed under the Purchase Orders was "to be performed in accordance with the terms and

4    conditions of" the prior contracts is unsupported and conclusory.  There is no indication that

5    Hegney negotiated the Purchase Orders on behalf of Shapell or was involved in the transactions

6    beyond signing the Purchase Orders to approve them.  *See, e.g.*, CBC Purchase Order at SPM

7    01500.  Nor does Hegney provide any explanation for why the date fields for referring to prior

8    contracts were left blank.  St. Paul has produced no other evidence regarding the objective intent of

9    the parties.  St. Paul has also provided nothing to explain the basis for Hegney's knowledge, the

10   circumstances of her involvement, or whether the subcontractors were aware of Shapell's supposed

11   intent to incorporate the prior contracts.

12         Second, even if Hegney's bare statements were supported and accurate, they would fail to

13   resolve any ambiguity in St. Paul's favor because they merely indicate St. Paul's *subjective* intent

14   years after the date of contracting.  "[I]t is elementary that the uncommunicated subjective belief of

15   a contracting party is not competent evidence to prove the meaning of the contract."  *Stewart Title*

16   *Co. v. Herbert*, 6 Cal. App. 3d 957, 964 (1970).  At best, Hegney's declaration evidences only

17   Shapell's subjective, unexpressed intentions, and does not support an interpretation of the Purchase

18   Orders as incorporating the prior contracts.  "Although the intent of the parties determines the

19   meaning of the contract, the relevant intent is 'objective'—that is, the objective intent as evidenced

20   by the words of the instrument, not a party's subjective intent."  *Shaw*, 58 Cal. App. 4th at 54

21   (citation omitted); *see also id.* at 55 ("Nothing in the patent agreement hints at what the University

22   now claims was its long-held desire that the Patent Policy's inventor royalty provision not be

23   incorporated into the patent agreement.").  Thus, the "true" subjective intent of the contracting

24   parties is irrelevant if it remains unexpressed.  *Id.*; *see also Beck v. Am. Health Grp. Int'l, Inc.*, 211

25   Cal. App. 3d 1555, 1562 (1989); *City of Mill Valley v. Transamerica Ins. Co.*, 98 Cal. App. 3d 595,

26   603 (1979) ("While extrinsic evidence is sometimes permissible to 'determine the meaning the

27   parties gave to the words' of a written agreement, an undisclosed unilateral intent of the insurer of

28

Case No. 12-CV-05952-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING
DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

1    an insurance contract will be deemed 'immaterial.'" (citation omitted)).  Here, the Purchase Orders

2    were forms that Shapell created, and Shapell clearly knew how to express an intent to incorporate

3    other contracts: the Perma-Green change orders each contain a similar fill-in-the-blank boilerplate

4    reference to a prior contract, and in each change order Shapell filled in the relevant date of the prior

5    contract.  *See*, *e.g.*, Ex. 2 at SPM 01554.

6        For these reasons, St. Paul's attempt to invoke parol evidence in support of its interpretation

7    of the Purchase Orders is unavailing.  The Hegney Declaration and prior contracts provide

8    insufficient grounds for concluding that Shapell and the subcontractors objectively intended to rely

9    on all of the terms and conditions (and specifically the insurance provisions) of the prior contracts

10   in the subsequent Purchase Orders.

11       Because the Purchase Orders that gave rise to Padilla and CBC's work at the Eagle Ridge

12   Community Center do not incorporate the contracting parties' prior contracts with Shapell, the

13   Court concludes that the subcontractors were not contractually obligated to obtain additional

14   insured coverage for Shapell.  Accordingly, the Defendant insurers, NSIC and Virginia, had no

15   duty to defend Shapell as an additional insured in the underlying Calderon proceeding.  *See Certain*

16   *Underwriters*, 702 F. Supp. 2d at 1174.  There is no need for the Court to determine whether the

17   other exclusions identified by Defendants in the insurance policy apply.

18   **IV.      CONCLUSION**

19       For the foregoing reasons, the Court GRANTS Defendants' Motion for Summary Judgment

20   with respect to NSIC and Virginia, and DENIES St. Paul's Motion for Partial Summary Judgment

21   with respect to NSIC and Virginia.

22   **IT IS SO ORDERED.**

23   Dated: May 21, 2014

     _Lucy H. Koh_
     _____
     LUCY H. KOH
     United States District Judge